IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRITTANI J. SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 3:13-CV-1118 |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 15). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Brittani Scott's application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and REMANDS the case back to the Social Security Administration.

**I. PROCEDURAL HISTORY**

Plaintiff Brittani Scott ("Plaintiff" or "Scott") filed an application for Supplemental Security Income benefits on November 12, 2008. (Tr. 301). Scott alleged she became disabled on March 1, 2006 due to affective and anxiety-related disorders. (Tr. 92, 301). The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration. (Tr. 130, 133).

At Scott's request, administrative law judge ("ALJ") Melissa Warner convened an administrative hearing on March 25, 2011 to evaluate her application. (Tr. 57-89). Plaintiff,

1

represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE") also appeared and testified. (*Id.*). On March 25, 2011, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 97-106). After applying the five-step sequential analysis,[1] the ALJ determined Scott retained the ability to perform work existing in significant numbers in the national economy. (*Id.*). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 201).

While the appeal was pending, Scott filed a second claim for SSI on May 11, 2011. (Tr. 114). The State agency found that Scott was disabled, beginning on May 11, 2011. (Tr. 202). The Appeals Council then granted Plaintiff's request for review of her first claim for SSI. (Tr. 114). While doing so, the council affirmed the State agency's finding that Scott was disabled

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1) If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2) If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3) If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4) If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5) Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

beginning on May 11, 2011, and it remanded the case back to the ALJ for reevaluation of disability for the period prior to that date. (*Id.*).

A second administrative hearing was held before ALJ Warner on November 6, 2012. (Tr. 35-56). Scott, who was represented by council, appeared and testified. (*Id.*). VE Amy Kutschbach also testified via telephone. (*Id.*). On November 16, 2012, the ALJ rendered her decision that Scott retained the ability to work for the period from March 1, 2006 through April 30, 2011. (*Id*.). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 9).

The Appeals Council denied the request for review, making the ALJ's November 16, 2012 determination the final decision of the Commissioner. (Tr. 1-6). Plaintiff now seeks judicial review of the Commissioner's final decision.

## II. EVIDENCE

### A.  Personal Background Information

Scott was born on November 5, 1988, and was 24 years old on the date the ALJ rendered her decision. (Tr. 39, 92). Accordingly, she was considered a "younger person" for Social Security purposes. *See* 20 C.F.R. § 416.963(c). Plaintiff completed high school and does not have past relevant work experience. (Tr. 50, 64, 85).

### B.  Medical Evidence

In 2003 and 2005, Plaintiff was hospitalized for attempting to commit suicide through drug overdose. (Tr. 484, 573). At the time, Scott was ages 14 and 16. (Tr. 486, 573). She was diagnosed with bipolar disorder, depression, and attention deficit hyperactivity disorder ("ADHD"). (Tr. 574).

3

In January 2006, Scott began treating at Macomb Family Services, and her diagnoses were bipolar disorder, ADHD, and cannabis abuse. (Tr. 582). During September 2007, she withdrew from care and was described as non-compliant with treatment. (Tr. 582).

On July 25, 2008, Plaintiff underwent a consultative examination with F. Qadir, M.D. (Tr. 457-60). She came alone to the appointment, having driven herself, and appeared well-groomed. (Tr. 458). Scott reported that she was not taking psychotropic medication, because she lost her insurance, and without medication she experienced episodes of depression, mood swings, and irritability. (Tr. 457). She stayed to herself because she did not get along well with others. (*Id.*). On a daily basis, she performed light household chores, listened to music, or watched television. (*Id.*). Dr. Quadir described Scott as displaying low self-esteem, little motivation, and a sad mood. (Tr. 458). Scott denied hallucinations, delusions, and suicidal or homicidal ideation or plans. While Plaintiff reported feelings of helplessness and sleep disturbance, Dr. Quadir observed that she had good insight into her illness, logical thought process and speech, and normal psychomotor activity. (*Id.*). Scott's future plans were to move out of her mother's home and return to school. (Tr. 459). Dr. Qadir diagnosed bipolar disorder and assigned a global assessment of functioning ("GAF") score of 48, representing serious symptoms. (*Id.*).[2]

On November 3, 2008, Plaintiff was admitted to Firelands Regional Medical Center for one week of inpatient treatment. (Tr. 661). Her diagnoses were bipolar disorder (currently

---

[2] A GAF score "is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006) (*citing* DSM-IV-TR at 34). A score of zero represents the most severe level of impairment in psychological functioning, and a score of 100, the most superior. *Id.* A GAF score in the range of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 503. A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

4

depressed state with mood congruent psychosis), anxiety disorder, and personality disorder with borderline features.  Her drug screening was positive for cannabis.  Gregory Bishop, M.D., explained that Plaintiff was started on Lamictal and Celexa, and she showed gradual and progressive improvement of mood, with decreasing anxiety. (Tr. 661-62).  Scott became more interactive with patients and visible in the unit, and was free of suicidal thoughts. (Tr. 662).

On November 12, 2008, Scott was seen at Firelands Counseling and Recovery Services ("Firelands") for outpatient care. (Tr. 669-70).  Plaintiff reported a history of abuse from a young age. (Tr. 669).  At the time of treatment, Plaintiff was living with her great-grandmother. (*Id.*).  She recounted a prior plan to commit suicide when problems arose with her great-grandmother's son and his girlfriend. (*Id.*).  Scott was using marijuana every few days. (Tr. 670).  Her diagnoses were bipolar disorder, generalized anxiety, and post-traumatic stress disorder ("PTSD"). (Tr. 671).  Her current GAF score was 55, representing moderate symptoms. (*Id.*).

On December 1, 2008, Scott saw Dr. Bishop at Firelands for medication management. (Tr. 672).  Scott was trying to pursue her goals of working or returning to school and there was less conflict at home.  She reported periods of depression and anxiety, along with insomnia and auditory hallucinations.  She denied suicidal thoughts, though she had decreased motivation and easily became tearful.  Dr. Bishop opined that Scott's affect was moderately depressed and anxious, but she was pleasant and cooperative, with a goal-directed and organized thought process. (*Id.*). On December 29, 2008, Scott reported to Dr. Bishop that she was more irritable, angry and frustrated, and complained of racing thoughts. (Tr. 677).  She had trouble sleeping and experienced nightmares consistent with her previous abuse, but was not feeling depressed.  Dr. Bishop adjusted her medication. (*Id.*).

In January 2009, state agency consulting physician Douglas Pawlarczyk, Ph.D., reviewed the record to assess Scott's mental residual functional capacity. (Tr. 461-64). Dr. Pawlarczyk opined that Scott could perform simple repetitive tasks in a work environment with no strict production quotas and where no public contact was required and contact with coworkers was minimal. (Tr. 463).

Scott returned to Firelands on February 1, 2009, reporting that she had missed prior appointments because she did not like people. (Tr. 674). During the session, Scott was reality-based and denied suicidal ideation. Though she came in depressed, she left cheerful. Plaintiff reported self-discontinuing Seroquel due to weight gain. (*Id.*). On April 13, 2009, Scott treated with Dr. Bishop, who opined that she was moodier, more irritable, and anxious. (Tr. 690). Scott found Lamictal was not helpful, but Prozac somewhat alleviated her depression. Dr. Bishop adjusted her medications. (*Id.*).

On April 22, 2009, Irma Johnston, Psy.D., conducted a review of the updated record. (Tr. 481). She affirmed Dr. Pawlarczyk's assessment. (*Id.*).

In June 2009, Scott was seen at Firelands as a walk-in patient, and she presented as very agitated. (Tr. 688). She explained that a move with her mother to Florida had not worked out as planned, and her grandmother's home was overcrowded by the number of family members living there. Though Plaintiff experienced auditory hallucinations instructing her to commit suicide, she stated that she knew better than to do so. By the end of the session, Scott had calmed down and was pleasantly talking to the therapist. (*Id.*).

In August and September 2009, Plaintiff treated with Dr. Bishop. (Tr. 680-81). She reported mood swings, irritability, and anxiety, though she denied suicidal ideation and hallucinations. Scott had started classes at a community college. (*Id.*). During October 2009,

Plaintiff was severely depressed and tearful during a session in which she reported spending two days in jail due to a physical altercation with her uncle. (Tr. 720).

On November 3, 2009, Scott was admitted to Firelands Regional Medical Center and placed on suicide precautions. (Tr. 692). Family members had discovered her attempting to cut her wrist. (Tr. 695). Upon admission, Plaintiff endorsed auditory and visual hallucinations. (*Id.*). A drug screening was positive for cannabis. (Tr. 692). During her stay, Dr. Bishop opined that Scott's symptoms showed gradual improvement with medication adjustments and therapy. (Tr. 693). Dr. Bishop described Plaintiff's moods as better and her affect brighter. (*Id.*).

During January 2010, Scott followed up with Firelands and reported that she felt "like a different person and that she [was] able to control her emotions in a healthy way." (Tr. 711). She communicated to therapist Cheryl Gerber that overall things were going well, her sleep was improved, and she was excited to be in school. Ms. Gerber described Plaintiff as appreciative, happy, and future oriented. (*Id.*).

In March 2010, Plaintiff reported to Dr. Bishop some symptoms of depression, anxiety, low energy, and excessive sleep. (Tr. 722). Dr. Bishop adjusted her medications. (*Id.*). During April 2010 therapist Gerber noted that Plaintiff continued to attend college, described fewer anger episodes, and was functioning well with her current medication regiment. (Tr. 706). That same month, Dr. Bishop observed that Scott looked "quite well," and she felt less depressed. (Tr. 721). Though Plaintiff still reported irritability and anger, her sleep was better, and she experienced no hallucinations or suicidal thoughts. (*Id.*).

In August 2010, Dr. Bishop saw Scott for her four-month checkup. (Tr. 746). Scott admitted she was doing "pretty well." Dr. Bishop commented that Plaintiff's moods had been remarkably even, attention and sleep were good, and her anxiety minimal, unless triggered.

7

Scott indicated that she had moved into her own apartment away from her family, but she had to withdraw from college in the spring, because she lacked transportation and her grades were slipping. (*Id.*).

In October 2010, Plaintiff reported to Dr. Bishop that she was more anxious and depressed, though she denied suicidal ideation and hallucinations. (Tr. 743). Plaintiff was living alone, but unable to return to school due to lack of transportation, which affected her mood. (*Id.*). In November 2010, Scott reported anger and depression in relation to her mother's ex-boyfriend, who continued to live with her grandmother. (Tr. 742). She also stated that this time of the year was difficult for her because of many unpleasant anniversaries. (*Id.*). During December 2010, Scott reported stopping two of her medications due to unwanted side effects and bad flavor. (Tr. 741). Scott also admitted to overusing Xanax. Dr. Bishop adjusted medications and instructed Plaintiff to limit her use of Xanax. (*Id.*).

In January 2011, Dr. Bishop observed that Plaintiff's mood lability was improved. (Tr. 751). Scott did not report hallucinations, delusions, or suicidal ideation. Plaintiff described some depression with low energy, lack of interest, and sleeping excessively. She was still unable to return to school. (*Id.*). During a January 6, 2011 therapy session, Scott was excited to have her siblings be a more active part of her life and her affect was bright and smiling. (Tr. 752).

On April 4, 2011, Dr. Bishop completed a medical source statement describing Plaintiff's work-related abilities. (Tr. 762-64). He opined that Scott had no or only mild limitations in her ability to understand, remember, and carry out simple instructions, and to make judgments on simple work-related decisions. (Tr. 762). Scott was markedly limited in her ability to understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions. In support of these findings, Dr. Bishop wrote: "[Scott] is very labile

8

and very unpredictable. Although her intelligence is average, her abilities to consistently focus, concentrate, remain motivated are all impaired. She, for example, has been unable to remain in her college classes last year." (*Id.*). Dr. Bishop went on to opine that Plaintiff had moderate limitations in her ability to interact appropriately with the public and co-workers, and a marked limitation in interacting appropriately with supervisors. (Tr. 763). He also found her to be markedly limited in responding appropriately to usual work situations and changes in a routine work setting. To support these limitations the doctor wrote that Scott "has trouble interacting with people, including family, without demonstrating behavioral extremes—isolation and aggression." Dr. Bishop also noted that Scott was unable to restart her college classes and she was unable to function and live independently without relying on her family. The doctor reported that Scott occasionally used cannabis and rarely used alcohol. (*Id.*).

On April 5, 2011, Plaintiff was admitted to Firelands Regional Medical Center, due to suicidal ideation and increased depression symptoms. (Tr. 831). For the three days leading up to this hospitalization, Plaintiff's mother had stayed with her due to increased suicidal thoughts and other symptoms. Upon admission, Plaintiff had a very flat affect, racing thoughts, and auditory hallucinations. Scott had cut her wrists in the past as stress relief, and she was attempting to prevent herself from doing so again. Scott's home situation was noted to be disruptive to her mental health, with multiple family members having psychiatric issues. (*Id.*). Scott's anxiety was noted to worsen by family stressors. (Tr. 832). Plaintiff's anxiety improved during her stay and she remained social and cooperative. (Tr. 831-32). During her admission, Plaintiff indicated her desire to return to school and that her mom was attempting to get her a reliable car so she could do so. (Tr. 804). Scott's drug screening was positive for marijuana. (Tr. 830).

9

On April 7, 2011, a case manager from Community Psychiatric Supportive Treatment met with Plaintiff, who shared her symptoms and issues prior to her hospital admission. (Tr. 804). The healthcare provider was concerned that Plaintiff had not contacted her service provider for three months. Scott was reminded the importance of taking her medications as prescribed. (*Id.*). On April 15, 2011, Plaintiff was discharged from inpatient treatment at Firelands Regional Medical Center. (Tr. 799). Her diagnoses were bipolar disorder, attention deficit disorder, generalized anxiety disorder, personality disorder, and cannabis abuse. (Tr. 829).

On April 29, 2011, Plaintiff followed up with Dr. Bishop. (Tr. 799). Scott reported doing "fair," with some depression and anxiety. At times, Plaintiff's mother stayed with her in order to prevent her from harming herself. (*Id.*).

In July 2011, Scott reported to Dr. Bishop that she had been doing fairly well and her moods were relatively even, with minimal depression and anger episodes. (Tr. 797). Her anxiety was also fairly well moderated and her sleep was stable. Scott denied hallucinations, suicidal thoughts, and self-mutilatory behavior. (*Id.*).

In August 2011, Plaintiff was hospitalized after overdosing on Trazodone in an attempt to commit suicide. (Tr. 766). By November 2011, Plaintiff's mood swings were better, she was less anxious, and she experienced no suicidal ideation. (Tr. 790).

### III.  SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 12, 2008, the application date.

2. The claimant has the following severe impairments: major depressive disorder; anxiety; attention deficit hyperactivity disorder (ADHD); and posttraumatic stress disorder (PTSD).

3. The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: occasional exposure to temperature extremes, humidity and respiratory irritants; no exposure to obvious hazards; work with an SVP of 1 to 2, where the pace of productivity is not dictated by an external source over which the claimant has no control, such as an assembly line or conveyor belt; which that is repetitive from day to day, with expected changes; no contact with the general public; rare (meaning less than occasionally but not totally precluded) contact with co-workers; and occasional contact with supervisors.

5. The claimant has no past relevant work.

6. The claimant was born on November 5, 1988 and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7. The claimant has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not an issue because the claimant did not have past relevant work.

9. Considering the claimant's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that the claimant could have performed.

10. The claimant was not under a disability, as defined in the Social Security Act, since November 12, 2008, the date the application was filed, through April 30, 2011.

(Tr. 15-26) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

Plaintiff raises two main allegations of error.  First, she asserts that the ALJ improperly assessed the opinion of her treating psychiatrist, Dr. Bishop.  Second, that the ALJ failed to

12

consider the rationale for the grant of her subsequent application for benefits and the evidence related to it.  The Court will address these arguments in turn.

### A.  The ALJ's treating source analysis

Scott argues the ALJ's evaluation of Dr. Bishop fails to comport with the requirements of the treating source doctrine.  The record reflects that Plaintiff began treating with Dr. Bishop as early as November 2008.  In April 2011, Dr. Bishop authored a medical source statement describing the limitations that resulted from Plaintiff's mental impairments. (Tr. 762-63).  The parties do not contest Dr. Bishop's status as a treating physician.

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and treatment history.  *Id.*; 20 C.F.R. § 404.1527(c)(2).  Under the Social Security Regulations, opinions from such physicians are entitled to controlling weight if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The treating source's opinions are not entitled to such deference, however, if they are unsupported by the medical data in the record, or are inconsistent with the other substantial evidence in the record.  *See Miller v. Sec'y of Health & Human Servs.*, No. 91-1325, 1991 WL 229979, at *2 (6th Cir. Nov. 7, 1991) (Table).  When the treating physician's opinions are not entitled to controlling weight, the ALJ must apply specific factors to determine how much weight to give the opinion.  *Wilson*, 378 F.3d at 544, *see* 20 C.F.R. § 404.1527(c)(2)-(6).  The

13

regulations also advise the ALJ to provide "good reasons" for the weight accorded to the treating source's opinion. 20 C.F.R. § 404.1527(c). Regardless of how much weight is assigned to the treating physician's opinions, the ALJ retains the power to make the ultimate decision of whether the claimant is disabled. *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)).

In the present case, the ALJ discussed Dr. Bishop's April 2011 medical source statement and found the doctor's opinion unpersuasive. (Tr. 22-23). The ALJ assigned "moderate weight" to Dr. Bishop's conclusion that Plaintiff was limited to simple instructions and had moderate to marked limitations in dealing with others, because the restrictions were consistent with Plaintiff's difficulties in maintaining social functioning and concentration, persistence, and pace. (Tr. 23). The ALJ then assigned "some weight" to Dr. Bishop's opinion regarding Scott's ability to adapt to change. (*Id.*). The ALJ provided a number of reasons for devaluing Dr. Bishop's opinion. (Tr. 22).

Although it is clear that the ALJ did not accord controlling weight to Dr. Bishop's opinion, the ALJ did not articulate whether she devaluated the psychiatrist's opinion because it was not well-supported by medical evidence or because it was inconsistent with other substantial evidence of record. More problematic, however, are the ALJ's reasons for affording less than controlling weight to Dr. Bishop's opinion.

A number of the reasons the ALJ provides for discounting Dr. Bishop cannot be deemed "good reasons." First, the ALJ questioned Dr. Bishop's medical source statement because it was issued just one day before Scott experienced an episode of decompensation and was hospitalized. (Tr. 22). It is accurate that Dr. Bishop authored his report the day before Plaintiff underwent inpatient treatment in April 2011. Nevertheless, Dr. Bishop expressly indicated that his medical

14

source statement findings covered the period from October 2008 onward. (Tr. 763). The ALJ inappropriately concluded that Dr. Bishop's opinion was grounded on a limited view of Plaintiff's mental health, and such reasoning does not bolster the treating source finding.

The ALJ also discredited Dr. Bishop because the psychiatrist described Plaintiff's use of cannabis and alcohol as "occasional and rare." (Tr. 22, 763). The ALJ observed that Scott repeatedly tested positive for marijuana at her hospital admissions, and, as a result, the ALJ was uncertain whether Dr. Bishop adequately considered the effects of such drug use on Scott's symptoms and limitations. (Tr. 22). Nevertheless, earlier in the disability determination, the ALJ seemingly agreed with Dr. Bishop. Under step two of the sequential analysis, the ALJ found that Scott's "occasional marijuana use" did not even minimally affect her functioning. (Tr. 17). The ALJ's opinion as to Scott's substance abuse is unclear, and without further explanation, does not serve as a good reason to discredit Dr. Bishop.

Additionally, the ALJ afforded less weight to the psychiatrist because his finding of a marked limitation in adapting to change was inconsistent with Plaintiff's self-report. (Tr. 22). In an adult functioning report, Plaintiff explained that she handled changes in routine in the following manner: "Not too well. I'm kind of set in my ways, have systems, but I can adapt if needed." (Tr. 336). Scott's statement regarding her adaptability does not clearly portray the severity of her limitations. Her statement could arguably correspond to a marked limitation as that term was defined by Dr. Bishop's medical source statement.[3] Therefore, it was unreasonable for the ALJ to discredit Dr. Bishop on this ground.

---

[3] The medical source statement defined a "marked limitation" as "a substantial loss in the ability to effectively function." (Tr. 762). A "moderate limitation" was defined as "more than a slight limitation . . . but the individual is still able to function satisfactorily." An "extreme limitation" was described as "no useful ability to function." (*Id.*).

The ALJ's observation that Dr. Bishop's treatment records did not support the limitations assigned by the psychiatrist is also problematic here.  The ALJ observed that "Dr. Bishop's opinion is not supported by his treatment records overall, which generally show mild to moderate symptoms other than during the claimant's few episodes of decompensation." (Tr. 22).  However, the ALJ did not elaborate on this point or identify specific portions of the record to bolster this general observation.  While the ALJ's opinion describes some treatment notes from Dr. Bishop, it does not adequately demonstrate how such notes fail to support the limitations assigned.  The ALJ's recitation of the evidence shows periods of improvement and other periods of serious symptoms. (Tr. 21).  While Plaintiff treated with Dr. Bishop, and before he issued his treating source statement, Plaintiff decompensated such that she required hospitalization rather frequently, including episodes in November 2008 and November 2009.  Scott also underwent hospitalization again in April 2011, immediately after Dr. Bishop issued his report.  Despite the ALJ highlighting Scott's improvement from approximately January to August 2010, overall the period of treatment with Dr. Bishop prior to the issuance of his medical source statement shows a lack of stability in Plaintiff's medical health and frequent medication adjustments.  Even when Plaintiff was not hospitalized, records show notable declines in Plaintiff's mental health.  Accordingly, without more explanation, the ALJ's reasoning in this regard does not support the treating source analysis.

The ALJ did provide some reasons for discrediting Dr. Bishop that are supported by the record.  For example, the ALJ noted Dr. Bishop opined that Plaintiff's ability to consistently focus, concentrate, and remain motivated were all impaired.  As an example to justify such impairment, Dr. Bishop pointed out that Scott dropped out of community college.  However, the ALJ correctly observed that transportation issues, rather than mental health limitations, forced

Scott to stop attending college. (Tr. 22). The record does not reflect that mental health issues affected Scott's ability to remain in school, making it reasonable for the ALJ to question Dr. Bishop's opinion on this ground.

Additionally, the ALJ correctly found Dr. Bishop's observation that Plaintiff was unable to "function or live independently" without her family was inaccurate. (Tr. 22). Dr. Bishop's statement appears to be overreaching. Scott moved into her own apartment, away from family, around August 2010. (Tr. 22, 746). It is true that Plaintiff's mother would check on her daily and sometimes spent the night if Plaintiff was in a serious state of depression. (Tr. 72-74). However, Plaintiff attested that her mother provided only limited assistance, such as with laundry or cleaning, and at times, her mother would spend the night simply because she wanted to get away from her own living situation. (*Id.*). Additionally, Plaintiff reported that she was able to perform a variety of activities of daily living, including cleaning, shopping, paying bills, caring for her grooming and hygiene, preparing small meals, and driving. (Tr. 18, 330-34). While Plaintiff received aid from family, the record substantially demonstrates that she was not entirely dependent or unable to function without assistance as Dr. Bishop's opinion seems to convey.

In the midst of discussing Plaintiff's ability to live independent of her family, the ALJ also noted that all of Plaintiff's episodes of decompensation were linked to family stressors. (Tr. 22). The ALJ further noted that Plaintiff's symptoms improved when she moved to an apartment away from family in August 2010. (*Id.*). The record indicates that family stress often caused Plaintiff's mental health symptoms to escalate. Yet, the ALJ's intent in making this observation is not entirely clear. The ALJ perhaps meant to assert that removing Plaintiff from a family setting resulted in improved mental functioning and undermined Dr. Bishop's opinion. However, assuming, without deciding, that this was the ALJ's intent, the ALJ's finding is

questionable.  Even after Plaintiff moved into her own apartment, she experienced episodes of decompensation.  These episodes were tied to family stress, but it was nevertheless inappropriate for the ALJ to conclude Scott could cope with other types of stress, without pointing to evidence demonstrating such.

While two of the ALJ's observations regarding Dr. Bishop are supported by the record, they are insufficient to carry the ALJ's treating source analysis in this case.  Taking into account the notable instability in Plaintiff's mental health and frequent medication adjustments, coupled with the ALJ's various incorrect findings as to Dr. Bishop, remand is appropriate for the ALJ to articulate sufficient, accurate rationale for the decision to discredit the treating psychiatrist.  In rendering a second review, the ALJ should take care to consider the factors denoted in 20 C.F.R. § 416.927(c) for evaluating opinions issued by medical sources.

The Commissioner asserts that the ALJ's opinion with regard to Dr. Bishop is supported by substantial evidence.  The Commissioner notes that the ALJ pointed out periods in which Plaintiff's health declined when she was non-compliant with treatment, but showed improvement when she complied.  However, despite the ALJ noting Scott's non-compliance and the effects of medication, the ALJ did not question Dr. Bishop's report on such grounds and relying on this argument to uphold the ALJ's decision would result in the Court engaging in *post hoc* rationalization, which is prohibited.  *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009); *Martinez v. Comm'r of Soc. Sec.*, 692 F. Supp. 2d 822, 826 (N.D. Ohio 2010).

The undersigned recognizes that an adjudicator's failure to adhere to the treating source rule may not always warrant remand.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).  A violation of the rule may be deemed harmless where (1) the treating source's opinion is patently deficient; (2) the ALJ makes findings consistent with the doctor's opinion; or (3) the

ALJ satisfies the goal of the "good reasons" requirement despite failing to adhere to the letter of the regulation. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (*quoting Wilson*, 378 F.3d at 547).  However, in the present case, none of the above circumstances apply. Because the ALJ's opinion does not permit the Court a clear understanding for the weight assigned to Dr. Bishop's opinion, remand is necessary.

### B.  The ALJ's consideration of the record

Plaintiff contends that the ALJ erred in failing to consider the record as a whole. According to Scott, the ALJ ought to have considered the rationale underlying her May 2011 award of SSI benefits.  Additionally, Plaintiff argues that the ALJ ought to have given greater attention to the evidence in the record that was developed after the May 2011 award.  Plaintiff's argument lacks merit.

The Sixth Circuit has explained that the "Commissioner treats later-filed applications as separate claims." *Watson v. Comm'r of Soc. Sec.*, 40 F. App'x 896 (6th Cir. 2002).  This approach is both "logical" and "sensible, reflecting the reality that the mere passage of time often has a deleterious effect on a claimant's physical or mental condition." *Id.* (*citing Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476 (4th Cir. 1999)).  A subsequent award of benefits "is not relevant" to a claimant's condition in an application for benefits covering an earlier time period. *Presley v. Comm'r of Soc. Sec.*, 23 F. App'x 229, 231 (6th Cir. 2001).

In the present case, a disability decision on a separate application was rendered in May 2011, finding that Plaintiff was disabled as of May 11, 2011.  The rationale for this earlier decision does not have bearing on Plaintiff's current application, which is focused on March 2006 to May 11, 2011.  The Appeals Council specifically instructed the ALJ to assess whether Plaintiff was disabled "with respect to the period prior to May 11, 2011." (Tr. 114).

Plaintiff also asserts that the ALJ ought to have more thoroughly considered record evidence that developed after May 11, 2011, the date from which she was found to be disabled. Scott argues that the evidence is relevant because it demonstrates ups and downs in her mental health that were similar to those that occurred during the period at issue before the ALJ.

Generally, an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 416.1477. As previously noted, the Appeals Council instructed the ALJ to assess Plaintiff's application as to the period prior to May 11, 2011, and the ALJ acknowledged that this was the relevant period at issue. (Tr. 22). It appears that the ALJ sufficiently considered and accounted for the relatively limited amount of evidence that developed after May 2011. For example, in her opinion, the ALJ referenced treatment notes from Plaintiff's August 2011 psychiatric hospitalization. (Tr. 22, 766). Additionally, the ALJ acknowledged that Plaintiff continued to follow up with Dr. Bishop after the spring of 2011, but observed that these records were dated after the time period at issue. (Tr. 22). As a result, they were of lesser probative value, particularly given the scope of the Appeals Council's remand order. More thorough consideration was not necessary.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly, the final decision of the Commissioner is REVERSED and REMANDED for further proceedings.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  September 4, 2014.